ALBERT B. SAMBAT (CSBN 236472)
E. KATE PATCHEN (NYRN 4104634)
ALEXIS J. LOEB (CSBN 269895)
DAVID J. WARD (CSBN 239504)
MICAH L. RUBBO (CSBN 267465)
U.S. Department of Justice
Antitrust Division
450 Golden Gate Avenue
Box 36046, Room 10-0101
San Francisco, CA 94102
albert.sambat@usdoj.gov
Telephone: (415) 934-5300

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MICHAEL MARR,<br>JAVIER SANCHEZ,<br>GREGORY CASORSO, and<br>VICTOR MARR,<br><br>Defendants. | CASE NO. CR 4:14-00580 PJH<br><br>**UNITED STATES' RESPONSE TO DEFENDANTS' MOTION TO SUPPRESS VIDEO AND AUDIO RECORDINGS** |

| | **TABLE OF CONTENTS** |
|---|---|
| TABLE OF AUTHORITIES……………………………………………………………………..ii | |
| INTRODUCTION ................................................................................................................................1 | |
| BACKGROUND ..................................................................................................................................1 | |
| I. | Alameda County and Contra Costa County Public Real Estate Foreclosure Auctions ...................1 |
| II. | The Government's Investigation of Bid Rigging and Mail Fraud in Alameda County and Contra Costa County ............................................................................................................2 |
| | A. The Alameda County Investigation ...............................................................................2 |
| | B. Contra Costa County Investigation ................................................................................3 |
| | C. Overt Investigation and Prosecution ..............................................................................4 |
| ARGUMENT .......................................................................................................................................5 | |
| I. | Defendants Do Not Have Standing...............................................................................5 |
| II. | Defendants' Motion Is Moot Because the Government Will Not Seek to Use the Stationary Recordings or Any Evidence Derived from Them..........................................................................7 |
| | A. The Government Will Not Use the Stationary Recordings ..................................................7 |
| | B. No Derivative Evidence........................................................................................7 |
| III. | Defendants Have Not Established That the Government Violated Their Reasonable Expectation of Privacy..........................................................................................9 |
| | A. Defendants Failed to Demonstrate a Subjective Expectation of Privacy ............................9 |
| | B. Defendants Had No Objectively Reasonable Expectation of Privacy .............................10 |
| | C. Visual Surveillance at the Public Auctions Does Not Violate a Reasonable Expectation of Privacy .................................................................................14 |
| CONCLUSION...................................................................................................................................15 | |

| | |
|---|---|
| 1 | **TABLE OF AUTHORITIES** |
| 2 | **CASES** |

3    *Alderman v. United States*, 394 U.S. 165 (1969) .................................................................. 5

4    *California v. Ciraolo,* 476 U.S. 207, 213 (1986)……………………………………..….14

5    *Hester v. United States*, 265 U.S. 57 (1924) ...................................................................... 14

6    *In re John Doe Trader Number One*, 894 F.2d 240 (7th Cir. 1990) ........................................... 10

7    *Katz v. United States*, 389 U.S. 347 (1967) ........................................................... 9, 10, 11

8    *Kee v. City of Rowlett, Texas,* 247 F.3d 206, 213-15 (5th Cir.2001)………………………..10, 13

9    *Minnesota v. Carter, 525 U.S. 83 (1998)*................................................................... 9, 10

10    *Murray v. United States*, 487 U.S. 533 (1988) ..................................................................... 8

11    *Nix v. Williams*, 467 U.S. 431 (1984) .................................................................................. 8

12    *O'Connor v. Ortega,* 480 U.S. 709 (1987) .......................................................................... 9

13    *Oliver v. United States,* 466 U.S. 170 (1984) ..................................................................... 14

14    *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978) .................................................................. 5, 6

15    *Reynolds v. City and County of San Francisco*, 2012 WL 1143830 at *5 (N.D. Cal. Mar. 30, 2012) ..... 10

16    *United States v. Allard*, 600 F.2d 1301 (9th Cir. 1979) ....................................................... 8

17    *United States v. Azano Matsura*, No. 14-cr-388, 2015 WL 5449912 at *5 (S.D. Cal. Sept. 11, 2015) .. 5, 6

18    *United States v. Cella*, 568 F.2d 1266 (9th Cir. 1977)......................................................... 8

19    *United States v. Chamberlin*, 644 F.2d 1262 (9th Cir. 1980) .............................................. 8

20    *United States v. Chase*, 692 F.2d 69 (9th Cir. 1982) (per curiam) ..................................... 5

21    *United States v. Eschweiler,* 745 F.2d 435 (7th Cir. 1984) ............................................... 13

22    *United States v. Fisch*, 474 F.2d 1071 (9th Cir. 1973) ..................................................... 13

23    *United States v. Gonzalez,* 328 F.3d 543 (9th Cir. 2003) ......................................... 11, 12, 14

24    *United States v. Hessling*, 845 F.2d 617 (6th Cir. 1988) .................................................. 13

25    *United States v. Jackson,* 588 F.2d 1046, 1052 (5th Cir. 1979)……………………………..12, 13

26    *United States v. Kandik,* 633 F.2d 1334 (9th Cir.1980)..................................................... 8

27    *United States v. King*, 478 F.2d 494 (9th Cir. 1973) ......................................................... 5

28    *United States v. Llanes*, 398 F.2d 880 (2nd Cir. 1968)................................................ 12, 13

| | | |
|---|---|---|
| 1 | *United States v. Lopez-Soto*, 205 F.3d 1101 (9th Cir. 2000) | 8 |
| 2 | *United States v. McIntyre*, 582 F.2d 1221 (9th Cir. 1978) | 11 |
| 3 | *United States v. McIver,* 186 F.3d (9th Cir. 1999) | 14 |
| 4 | *United States v. Padilla*, 508 U.S. 77 (1993) (per curiam) | 5 |
| 5 | *United States v. Scott,* 2011 WL 2413821 at * 1 (N.D. Ind. Jun. 10, 2011) | 12 |
| 6 | *United States v. Smith*, 155 F.3d 1051 (9th Cir. 1998) | 8 |
| 7 | *United States v. White*, 401 U.S. 745 (1971) | 13 |
| 8 | *Wong Sun v. United States*, 371 U.S. 471 (1963) | 8 |

**STATUTES**

Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510 *et seq* ........ 1, 5, 9

Fourth Amendment ............................................................................. 1, 5, 6, 7, 9, 12, 13, 14, 15

# INTRODUCTION

Defendants seek to suppress recordings that were captured by stationary audio and video recording devices activated during and around open, well-attended real estate foreclosure auctions held on public property ("stationary recordings"). Defendants' motion should be denied for several reasons. First, defendants have no standing to challenge the stationary recordings. The movant – defendant Michael Marr – was never recorded. The others have not identified any specific recordings that capture their voice, let alone violate their constitutional rights. Second, the motion is moot. The government does not intend to use any of the stationary recordings at trial. Third, even if the defendants can establish standing, the defendants have not established a basis to suppress these recordings under the Fourth Amendment or under Title III. Defendants and their coconspirators conducted their collusive activities on the steps of county courthouses, at public auctions attended by dozens of people, and in open areas with heavy foot traffic.

# BACKGROUND

## I. Alameda County and Contra Costa County Public Real Estate Foreclosure Auctions

The recordings that are the subject of defendants' motion were made at locations around the Alameda County and Contra Costa County public real estate auctions between March 2010 and December 2010. Declaration of Roahn Wynar ("Wynar Decl.") ¶¶ 8 and 14. The Alameda County auctions were held every weekday at 12:00 p.m. and 12:30 p.m. Wynar Decl. ¶ 10. An auctioneer would typically position him or herself at the top of the steps on the left or right side of the front entrance, or midway on the landing of the steps of the courthouse at 1225 Fallon Street, Oakland, California. *Id.* Prior to each individual auction, the auctioneer would announce the property to be auctioned. Wynar Decl. ¶ 11. Bidders would qualify before bidding on a property by showing the auctioneer cashier's checks in the amounts the bidder intended to bid. *Id.* Once bidders were qualified, the auction commenced, with bidders gathering around the auctioneer and calling out their bids. *Id.* Some time later, the winning bidder would meet with the auctioneer and fill out paperwork to document the purchase and give the auctioneer cashier's checks. *Id.*

The Contra Costa County auctions were held at 10:00 a.m. and 1:30 p.m. An auctioneer would typically position him or herself at the top of the steps on the left or right side of the front entrance, or

along the steps of the Contra Costa Superior Court courthouse located at 725 Court Street, Martinez, California. The auctions were carried out in the same manner as in Alameda County. Wynar Decl. ¶ 12.

## II. The Government's Investigation of Bid Rigging and Mail Fraud in Alameda County and Contra Costa County

Beginning in January 2010 and continuing through March 2010, the FBI interviewed two real estate investors who provided information about bid rigging and fraudulent conduct occurring at the public real estate foreclosure auctions in Alameda and Contra Costa counties. Wynar Decl. ¶ 3; Wynar Decl. Exs. A, B, C, and D. These two real estate investors agreed to cooperate with the FBI in its investigation. The FBI first made contact with the first cooperator ("CHS-1") in January 2010. Wynar Decl. ¶ 4. CHS-1 admitted to personally participating in agreements not to compete at public auctions in exchange for payoffs or to obtain money from secondary auctions known as "rounds," in counties throughout Northern California, including Alameda and Contra Costa counties. Wynar Decl. ¶ 4. The FBI subsequently learned about another executive at CHS-1's company who had knowledge of and participated in anticompetitive agreements as well. *Id.* The FBI first interviewed the second cooperator ("CHS-2") in March 2010. CHS-2 also admitted to participating in anticompetitive agreements in the same counties as CHS-1. Wynar Decl. ¶ 6.

### A. The Alameda County Investigation

CHS-1 provided the FBI with the records he kept of anticompetitive agreements involving properties auctioned in Alameda and Contra Costa counties. Wynar Decl. ¶ 5; Wynar Decl. Ex. B. The records include notes of rounds, receipts, e-mail communications, and spreadsheets detailing the properties for which CHS-1's company engaged in rounds or payoffs and received or made payments. *Id.* The spreadsheets also contain information about the properties that were subject to the anticompetitive agreements and identify the conspirators involved, including defendants Michael Marr, Javier Sanchez, Gregory Casorso, and Victor Marr. *Id.* Thus, all four defendants were identified as suspects in the investigation prior to the FBI's placement of any stationary recording devices at the auction.

The second cooperator ("CHS-2") is an executive at CHS-1's company. Wynar Decl. ¶ 6; Wynar Decl. Exs. C and D. CHS-2 was interviewed multiple times in March 2010 and admitted to

personally participating in anticompetitive agreements in several counties in Northern California, including San Mateo, Alameda, and Contra Costa counties. *Id.* CHS-2 provided information showing that he reached these anticompetitive agreements with real estate investors, including Michael Marr, Gregory Casorso, Javier Sanchez, and Victor Marr. *Id.* During the rounds, CHS-2 created notes concerning the anticompetitive agreements. *Id.* CHS-2 supplied these notes or information from those notes to CHS-1. *Id.*

Based on the cooperators' information, an undercover agent began attending auctions in Alameda County to engage in consensual monitoring to gather further evidence of the bid-rigging and fraudulent scheme. Wynar Decl. ¶ 7. The FBI also conducted visual surveillance. *Id.* In addition, the FBI installed microphones in public spaces in the vicinity of the public auctions outside the courthouse at 1225 Fallon Street, Oakland, for the purpose of making recordings around the time of the public auctions. Wynar Decl. ¶ 8.

Before the microphones were first installed, defendants Michael Marr and others had been identified as subjects in the investigation of the foreclosure auctions in Alameda County. Wynar Decl. ¶ 9; *see, also,* Wynar Decl. Exs. E, F, G, and H. Defendant Javier Sanchez and others had been identified as subjects in the investigation in Contra Costa County. *Id.* However, Michael Marr was never intercepted on any of the stationary recording devices. Wynar Decl. ¶ 26. All of the microphones used in the recording devices cost $23, are publicly available, and are less sensitive than a healthy human ear. Wynar Decl. ¶ 15.

### B. Contra Costa County Investigation

The investigation in Contra Costa County accelerated in June 2010 when the FBI developed another source ("CHS-3"). Wynar Decl. ¶ 13, Ex. I. This new source was an employee of a real estate investment company that purchased properties at the foreclosure auctions in Contra Costa County. CHS-3 came to the FBI in June 2010 and admitted to reaching anticompetitive agreements at the foreclosure auctions in Contra Costa County. *Id.* CHS-3 wore a concealed recording device and allowed the FBI to monitor his telephone calls. *Id.*

Stationary recording devices – equipped to make audio and video recordings – were installed in various public spaces where the bidders congregated near the Contra Costa County courthouse at 725

Court Street, Martinez. Wynar Decl. ¶ 14. Just like the Alameda County auctions, all of the microphones used in the recordings devices that were installed in Contra Costa County cost $23, are publicly available, and are less sensitive than a healthy human ear. Wynar Decl. ¶ 15.

### C. Overt Investigation and Prosecution

In January 2011, the government sought and received court authorization to execute a total of seven search warrants in connection with its ongoing investigation of the public real estate foreclosure auctions in Alameda and Contra Costa counties. Wynar Decl. ¶ 17. All seven search warrant applications were based on information and evidence obtained during the investigation, including information from the cooperators, the undercover agent, and the consensual recordings. *Id.* The applications were not supported in any way by the use of the stationary recording devices, including by the recordings themselves or by evidence (if any) derived from them. *Id.*

Between June 2011 and June 2015, thirty-seven individuals pleaded guilty to bid-rigging and mail-fraud charges and are cooperating with the investigation of the public real estate foreclosure auctions in Alameda and Contra Costa counties. Wynar Decl. ¶ 16. Nearly all of the pleading defendants were interviewed and have provided statements and documents proving the bid-rigging and fraud schemes and implicating Michael Marr, Javier Sanchez, Gregory Casorso, and Victor Marr. *Id.* In addition to the evidence developed from the search warrants, witness interviews, and documents voluntarily produced by cooperators, the government also obtained documents from various real estate firms, trustee companies, posting companies, and banks pursuant to grand jury subpoena. *Id.*

On November 19, 2014, a federal grand jury charged Michael Marr, Javier Sanchez, Gregory Casorso, and Victor Marr with two counts of bid rigging in violation of 15 U.S.C. § 1 and six separate counts of mail fraud in violation of 18 U.S.C. § 1341. On January 14, 2015, the government provided the defendants with all of the consensual and stationary recordings.[1] On March 15, 2016, it notified the defendants that it does not intend to use any of the stationary audio recordings at trial.[2]

//

---

[1] See United States' Response to Defendants' Motion to Order Early Disclosure of Witness and Exhibit Lists, p. 2.

[2] *Id.*

No. CR 4:14-00580 PJH
US' RESPONSE TO DEFENDANTS' MOTION TO SUPPRESS VIDEO AND AUDIO
RECORDINGS                    4

## ARGUMENT

Defendants do not have standing to challenge the stationary recordings wholesale because they either were not a party to any recordings or have failed to allege that a specific recording violated their rights. Even if they could establish standing, the motion is moot because the the government does not intend to use the stationary audio recordings or any evidence derived therefrom—there is no such derivative evidence. Finally, should the Court find it necessary to reach the merits, defendants' Fourth Amendment and Title III claims fail because they have not established that the stationary recordings violated their reasonable expectation of privacy. The motion to suppress should be denied.

### I. Defendants Do Not Have Standing

As a threshold matter, the proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated. *Rakas v. Illinois*, 439 U.S. 128, 130 n.1, 133-34 (1978). This is because Fourth Amendment rights are personal and "may not be vicariously asserted." *Id.* at 133-34; *see also United States v. Chase*, 692 F.2d 69, 70 (9th Cir. 1982) (per curiam). This same rule applies to recordings obtained pursuant to Title III, which allows for only an "aggrieved person" to move to suppress wiretap evidence. 18 U.S.C. § 2518(10)(a). Thus, a defendant cannot move to suppress a recording or its fruits unless "his privacy was actually invaded; that is, if he was a participant in an intercepted conversation, or if such conversation occurred on his premises." *United States v. King*, 478 F.2d 494, 506 (9th Cir. 1973), *citing Alderman v. United States*, 394 U.S. 165, 176 (1969). Likewise, a defendant cannot assert the rights of others, even his codefendants or coconspirators. *United States v. Padilla*, 508 U.S. 77, 81-82 (1993) (per curiam).

Here, defendants have not established that they have standing to suppress any of the stationary recordings despite having access to all the stationary recordings since January 2015. Defendant Marr lacks standing because he was never recorded. *See United States v. Azano Matsura*, No. 14-cr-388, 2015 WL 5449912 at *5 (S.D. Cal. Sept. 11, 2015) (holding that defendants only had standing to seek suppression of wiretap evidence arising out of specific conversations in which they had a privacy interest). And the other defendants have not pointed to any specific recordings that allegedly violated their constitutional rights, let alone any tainted derivative evidence. The stationary recordings were made on different days and capture numerous different conversations among different coconspirators.

1   Defendants' attempt to exclude all of the recordings in a blanket fashion is improper. They must first
2   establish that they were the "aggrieved person" in each recording that they claim should be suppressed.
3   *See Rakas,* 439 U.S. at 30 n.1 (noting that the defendant bears "the burden of establishing that his own
4   Fourth Amendment rights were violated").

5   *Azano Matsura,* 2015 WL 5449912, is instructive. In *Azano Matsura,* two defendants moved to
6   suppress all the recordings obtained from a wiretap of a cell phone belonging to a third individual and all
7   evidence derived from them. 2015 WL5449912 at *2. The government argued that the defendants only
8   had standing to seek suppression for communications to which they were a party. *Id*. In addition, the
9   government informed the defendants and the court that it would not use the wiretap or any derivative
10  evidence at trial. *Id*.

11  The court held that the defendants had limited standing to seek suppression only of wiretap
12  evidence arising out of the specific conversations in which they had a privacy interest. *Id*. at *5. The
13  court then focused on those specific recordings in which the defendants had standing. With respect to
14  one of the intercepted calls, the government sufficiently demonstrated that the challenged wiretap
15  produced no derivative evidence. *Id*. The fact that "[t]he communication was not included in any search
16  warrant affidavits" was an important factor in the court's analysis. *Id*. at *5. As for the other defendant,
17  the court was satisfied that any information that was garnered from the two intercepted conversations
18  could be excised completely from the search warrant affidavits without diminishing the existence of
19  probable cause. *Id*. Because the government indicated that it would not introduce the challenged calls
20  into evidence at trial and no significant evidence was derived from the calls, the defendants' motion to
21  suppress was denied as moot. *Id.*

22  *Azano Matsura* sets out the proper analysis for this case. First, the Court should determine who
23  has standing to challenge the legality of each recording. Then, it should determine whether the
24  government made derivative use of the recordings, and finally, whether that derivative use violated the
25  Fourth Amendment. The Court need not engage in this entire fact-intensive analysis, however, because
26  defendants have not cleared the first hurdle – standing.
27  //
28  //

## II. Defendants' Motion Is Moot Because the Government Will Not Seek to Use the Stationary Recordings or Any Evidence Derived from Them

Even if the Court finds that one or more of the defendants has standing to challenge some of the recordings, the motion should be denied because it is moot. On March 15, 2016, the government informed defense counsel that it does not intend to use any audio from the stationary recordings at trial.[3] Dkt. 68, Ex. B. Moreover, the government did not derive any evidence from those recordings. Therefore, defendants' motion should be denied as moot.

### A. The Government Will Not Use the Stationary Recordings

Due to the technological limitations of the stationary audio recording devices, recordings are often substantially unintelligible, with large portions capturing background noise, dead air, jack hammering from the street, or the cacophony of voices at a crowded auction. Wynar Decl. ¶ 18. In a handful of recordings, some voices can be heard issuing numeric bids in what presumably are secondary auctions on an unidentified property. Wynar Decl. ¶¶ 19-20. On a number of other stationary recordings, the majority of audible noises are related to the auctioneer crying the auction, rather than discernible conversation. Wynar Decl. ¶ 21. As a result, there are few stationary recordings of any evidentiary value.

### B. No Derivative Evidence

The few intelligible stationary recordings produced no derivative evidence. The government showed five stationary recordings to four witnesses to determine whether to introduce them through these witnesses in a future trial. Wynar Decl. ¶ 19. Since the government no longer intends to introduce any stationary recordings, there is no disputed issue here. In a claim of taint, the initial burden is on the defendant to show that his or her Fourth Amendment rights were violated and that there is a "factual

---

[3] Defendants wrongly characterize this statement of intent as a concession that the stationary recordings were unlawful. The government's position here is that the recordings did not violate the Fourth Amendment or Title III because the defendants cannot establish a reasonable expectation of privacy in the open public area of the real estate foreclosure auctions. *See United States v. Giraudo, et al.*, 14-CR-00534 CRB, Dkt. 62, pp. 9-15. The government's decision not to use the recordings reflects the fact that the little evidentiary value they have pales in comparison to the rest of the government's evidence, including consensual recordings, testimony and documents provided by cooperating witnesses, and documents obtained from subpoena. As a matter of practical trial strategy, the government intends to focus its case on its strongest, not its weakest, evidence, and therefore informed the defendants to avoid wasting their time or the Court's in litigating the suppression issue.

nexus between the illegality and the challenged evidence." *See United States v. Kandik*, 633 F.2d 1334, 1335 (9th Cir. 1980); *see also United States v. Cella*, 568 F.2d 1266, 1284 (9th Cir. 1977) ("Initially, the defendant who shows that he was the victim of an unconstitutional search must go forward with specific evidence demonstrating taint."). Once the defendants meet their initial burden, the government has the ultimate burden of proof to show the absence of taint. *United States v. Allard*, 600 F.2d 1301, 1305 (9th Cir. 1979). However, the mere establishment of an illegal search does not place upon the government the burden of affirmatively proving that each and every piece of evidence is free from taint. *Id*. Here, where the recordings themselves are barely audible and the government has derived no fruits from them, defendants cannot meet their burden.

Moreover, evidence is not fruits of improperly obtained evidence if it: (1) was obtained through a source independent from the tainted evidence, *Murray v. United States*, 487 U.S. 533, 537 (1988); *United States v. Chamberlin*, 644 F.2d 1262, 1268-69, (9th Cir. 1980); (2) would have been inevitably discovered, *Nix v. Williams*, 467 U.S. 431, 447 (1984); *United States v. Lopez-Soto*, 205 F.3d 1101, 1106 (9th Cir. 2000); or (3) the chain of causation between the improperly obtained evidence and additional evidence is too attenuated, *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963); *United States v. Smith*, 155 F.3d 1051, 1060 (9th Cir. 1998).

The evidence the government relied upon in this investigation and intends to introduce at trial was obtained from independent sources such as cooperators, consensual recordings, seized documents, and subpoenaed documents. Much of the information that was not known would have inevitably been discovered over the course of the investigation, given what was known at the outset. And any evidence from cooperators or others obtained months or years after the stationary recording devices were no longer in use is far attenuated from the stationary recordings. In addition, all the witnesses who were shown stationary recordings were previously interviewed many times and provided information about the defendants' involvement in the bid-rigging and fraud schemes before being shown the stationary recordings. *See* Wynar Decl. ¶¶ 23-25. Hence, no new evidence was derived from the stationary recordings shown in those interviews.

Since the government will not introduce the stationary recordings at trial and because no evidence was derived from them, the defendants' motion is moot.

### III. Defendants Have Not Established That the Government Violated Their Reasonable Expectation of Privacy

If the Court decides that the defendants have standing and there is a live, disputed issue to resolve with respect to specific recordings, it will find that the defendants' motion still fails. Defendants have not established that they had a reasonable expectation of privacy when they engaged in collusive behavior in an open, bustling public space.

The United States Supreme Court has long recognized that "[w]hat a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection." *Katz v. United States*, 389 U.S. 347, 351 (1967) (citations omitted). Under the Fourth Amendment, government activity does not constitute a search or seizure unless the activity violates an individual's "legitimate expectation of privacy." *Minnesota v. Carter*, 525 U.S. 83, 91 (1998).

The Fourth Amendment and Title III of the Omnibus Crime Control and Safe Streets Act of 1968 govern the legality of warrantless audio and video surveillance. 18 U.S.C. §§ 2510 *et seq*. In determining whether a search has occurred for purposes of the Fourth Amendment, courts apply the two-part test from *Katz*, examining (1) whether the party had a subjective expectation of privacy and (2) whether society is prepared to view that expectation as reasonable (or objective expectation of privacy). *See* 389 U.S. at 361 (Harlan, J., concurring). Title III complements the Fourth Amendment by prohibiting the "interception" of oral communications in situations where the communicating parties "exhibit[] an expectation that such communication is not subject to interception under circumstances justifying such expectation . . . ." §§ 2510(2), 2511(a)–(e). Although it uses the expression "not subject to interception," Congress intended Title III to be governed by the *Katz* expectation of privacy test. See S. Rpt. No. 90-1097, at 60 (1968), reprinted in 1968 U.S.C.C.A.N. 2112, 2178 ("The definition [of oral communication] is intended to reflect existing law.").

#### A. Defendants Failed to Demonstrate a Subjective Expectation of Privacy

Whether an individual has a subjective expectation of privacy that society is prepared to recognize is a highly fact-intensive inquiry. *See generally O'Connor v. Ortega,* 480 U.S. 709, 715 (1987). Courts consider a nonexclusive set of factors to determine whether an individual can demonstrate a reasonable expectation of privacy in any of those conversations: the volume of the

communication or conversation; the proximity or potential of other individuals to overhear the conversation; the potential for communications to be reported; the affirmative steps taken by the speakers to shield their privacy; the need for technological enhancements to hear the communications; and the place or location of the oral communications as it relates to the subjective expectations of the individuals who are communicating. *Reynolds v. City and County of San Francisco*, 2012 WL 1143830 at *5 (N.D. Cal. Mar. 30, 2012) (*citing Kee v. City of Rowlett, Texas*, 247 F.3d 206, 213-15 (5th Cir. 2001)).

While there is no bright-line rule that statements made in public areas, or in areas in which bystanders are located, are undeserving of protection, the ultimate determination requires a fact-intensive inquiry into not only the geographic location where the comments were made, but also whether other factors, taken as a whole, suggest that the speaker was justified in believing their statements would not be overheard. Defendants fall far short of meeting their burden since they have not offered any facts to establish that they had a subjective expectation of privacy in any of the conversations that were captured by stationary recordings.

### B. Defendants Had No Objectively Reasonable Expectation of Privacy

The extent to which an expectation of privacy is reasonable "may depend upon where those people are." *Minnesota*, 525 U.S. at 88. Thus, while "the Fourth Amendment protects people, not places," Justice Harlan, whose concurrence in *Katz* set the standard for modern Fourth Amendment jurisprudence, indicated in plain terms that "conversations in the open would not be protected against being overheard, for the expectation of privacy under the circumstances would be unreasonable." *Katz*, 389 U.S. at 361 (Harlan, J., concurring).

#### 1. The Conversations That Were Recorded at the Public Auctions and Nearby Public Areas Were Not Private

"The openness of the place where the oral communications are spoken" countenance against finding a reasonable expectation of privacy. *Kee*, 247 F.3d at 217 n. 21. Additionally, conversations conducted in close proximity to unknown third parties are not private and therefore are not protected by Title III or the Fourth Amendment. *See Kee*, 247 F.3d at 214. For example, in *In re John Doe Trader Number One*, 894 F.2d 240, 242-43 (7th Cir. 1990), a trader made incriminating statements on the

No. CR 4:14-00580 PJH
US' RESPONSE TO DEFENDANTS' MOTION TO SUPPRESS VIDEO AND AUDIO
RECORDINGS        10

"noisy and frantic" floor of the Chicago Mercantile Exchange, which were intercepted by an agent wearing a recording device. Even though the agent was not always a party to the intercepted communications at issue, the court held that the trader did not have a reasonable expectation of privacy because of his proximity to the agent and others present on the trading floor. *Id.* at 246.

The open, public, and well-populated nature of auction areas at the time of the auctions stands in contrast to the cases cited by the defendants, such as *Dorris v. Absher*, 179 F.3d 420 (6th Cir. 1999), *United States v. McIntyre*, 582 F.2d 1221, 1223-24 (9th Cir. 1978), *Opal v. Cencom E 911*, 1994 WL 559040 (N.D. Ill. Oct. 5, 1994), *United States v. Williams*, 15 F. Supp. 3d 821 (N.D. Ill. 2014). Those cases all involved circumstances where there was no evidence that the comments made by the speaker could be heard outside of the room or enclosed area in which they were made. For example, in *Dorris*, the Sixth Circuit held that an employer who surreptitiously recorded his employees' conversations violated Title III. *Dorris*, 179 F.3d at 425. However, the employees in *Dorris* engaged in a conversation in a small, one-room office that could not be accessed without the employees' knowledge. *Id.* Further, they stopped their conversations whenever the telephone was used or when any visitors approached the office. *Id*. While the conversations in *Dorris* occurred in an isolated, enclosed space, defendants' conversations occurred in open public areas at and near the auctions attended by numerous strangers.

Defendants also cite *Katz* for the proposition that an individual has a right to be free from warrantless government eavesdropping in "places accessible to the public." Defs.' Mot. 3. However, *Katz* is distinguishable because Katz went into a phone booth and shut the door, making private a space that is generally accessible to the public. *Katz*, 389 U.S. at 352. In contrast, the defendants here did not enter any enclosed space. They conducted their activities outdoors in bustling public areas where the potential to be overheard was ever-present.

Indeed, in *United States v. Gonzalez,* 328 F.3d 543, 547 (9th Cir. 2003), the defendant, who was visually recorded retrieving a package containing illegal drugs in a "quasi-public" hospital mailroom, contended that "a temporary zone of privacy was created when he was alone with [the coschemer]" in the mailroom. But the Ninth Circuit rejected this contention and, noting the lessened expectation of

//

No. CR 4:14-00580 PJH
US' RESPONSE TO DEFENDANTS' MOTION TO SUPPRESS VIDEO AND AUDIO RECORDINGS             11

privacy in a commercial setting, refused to create a legal "shield impenetrable to law enforcement view even in the most public places." *Id.* at 548.

While *Gonzalez* addressed visual surveillance, *United States v. Scott,* 2011 WL 2413821 at * 1 (N.D. Ind. June 10, 2011) applied the same rationale to audio surveillance. In *Scott,* law-enforcement officials hid a recording device in a confidential informant's ("CI") car. *Id.* at *1. Unaccompanied by the CI, a suspected drug dealer drove the car to the defendant's home. *Id.* at * 2. While the car was parked, the recording device captured conversations between the defendant and the suspected drug dealer that occurred in the defendant's driveway. *Id.* The defendant moved to suppress the conversations because the CI was not present when the conversations between the defendant and suspected drug dealer were recorded. The court denied the defendant's motion, concluding that he failed to establish a reasonable expectation of privacy because the conversations occurred in a publicly accessible area near the street and sidewalk in a residential neighborhood. *Id.* at *8-9.

Similarly, in this case all of the conversations that defendants seek to suppress occurred in an open space that was not only accessible to members of the public, but was actually accessed during the auctions by dozens of them, who had the potential to overhear defendants' conversations. Although the recordings do not pick up many intelligible conversations, the variety of sounds and noise levels makes it clear that the auction site was a busy, public place. In this situation, there was a clear potential that defendants could be overheard if they were talking in a voice loud enough to be heard by others or recorded by the devices placed by the FBI in the vicinity.

### 2. The Stationary Recording Devices Did Not Capture Conversations That Could Not Be Heard by a Bystander

Conversations are not private and thus not protected by the Fourth Amendment when they are "exposed to the 'plain view' of others." *United States v. Jackson*, 588 F.2d 1046, 1052 (5th Cir. 1979); *see also United States v. Llanes*, 398 F.2d 880, 884 (2d Cir. 1968) (holding that "conversations carried on in a tone of voice quite audible to a person standing outside the home are conversations knowingly exposed to the public"). In this case, the recorded conversations were those exposed to the "plain view" of others – that is, they could be heard by passers-by and other auction attendees – and are therefore not ones in which defendants had a reasonable expectation of privacy. *See Jackson*, 588 F.2d at 1052.

Extensive caselaw supports this position. In *Jackson*, for example, police officers were able to hear the defendants' conversations in a motel room by simply listening from an adjoining room. *Id*. at 1051. The court held that the defendants failed to demonstrate a reasonable expectation of privacy because the defendants, speaking in a normal tone of voice, could be overheard by officers in the adjoining room, rendering their expectation of privacy unreasonable. *Id.* at 1054-55; *see also United States v. Fisch*, 474 F.2d 1071, 1078-79 (9th Cir. 1973) (per curiam) (finding no reasonable expectation of privacy that conversations will not be heard through a common door in an adjoining hotel room); *United States v. Hessling*, 845 F.2d 617, 619 (6th Cir. 1988) (finding no reasonable expectation of privacy for conversations overheard without an artificial device).

Although the court in *Jackson* noted the police did not use electronic equipment to record the defendants' conversations, its holding did not hinge on the absence of a recording device. Nor did the *Jackson* decision rest on the physical presence of the agents in the adjoining hotel room. Rather, the *Jackson, Fisch,* and *Hessling* decisions stand for the unremarkable principle that conversations that can be readily overheard are not private and therefore are not protected by the Fourth Amendment.

In this case, the recording devices picked up what could be heard by a human ear. Because the recording devices captured conversations at the public auctions and surrounding public areas that could be overheard, there is nothing in the recordings that was not, or at least could not be, reasonably picked up by other ears at these auctions. Rather, the recorded conversations were those, like in *Jackson*, which were "words exposed to the 'plain view' of others." *Jackson*, 588 F.2d at 1052.

### 3. The Recording Devices Did Not Have Enhanced Capabilities

Additionally, the use of recording equipment to record otherwise audible conversations does not necessarily violate the Fourth Amendment, particularly when, as here, the recording was made with non-voice-enhancing equipment. *See United States v. White*, 401 U.S. 745, 751 (1971); *see also Kee,* 247 F.3d at 214. In *Kee*, the court indicated that "the need for technological enhancements to hear the communications" is a factor in evaluating whether a speaker has a reasonable expectation of privacy. 247 F.3d at 214; *see also United States v. Eschweiler,* 745 F.2d 435, 437-48 (7th Cir. 1984) (indicating that the Fourth Amendment may be implicated if amplifying equipment is required to overhear conversations that would be inaudible to the naked ear). This is not an issue in this case because the

microphones on the stationary recording devices were less sensitive than the human ear. See Wynar Decl. ¶ 15.

Because the recordings occurred in open, bustling public areas with the ever-present potential to be overheard, and because the recording devices were less sensitive than the human ear, the defendants cannot establish a reasonable expectation of privacy in the recorded conversations.

### C. Visual Surveillance at the Public Auctions Does Not Violate a Reasonable Expectation of Privacy

Defendants seek to suppress not only audio, but also apparently the video recordings that were captured from stationary devices and any and all evidence derived from them. Defs.' Mot. 3. It is well settled that videotaping of suspects in public places does not violate the Fourth Amendment. *United States v. McIver,* 186 F.3d 1119, 1125-26 (9th Cir. 1999), o*verruled on other grounds by United States v. Pineda-Moreno*, 688 F.3d 1087, 1091 (9th Cir. 2012). Indeed, the police may record what they normally may view with the naked eye. *Id.* at 1125. Accordingly, the Ninth Circuit has held that video surveillance in public places is permissible. *See, e.g., Gonzalez*, 328 F.3d at 548 (video surveillance in mailroom at a hospital); *McIver*, 186 F.3d at 1125 (video surveillance on public lands).

The Supreme Court has likewise approved of warrantless video surveillance in open space that is viewable to the public, even when on private property. *See, e.g., Hester v. United States*, 265 U.S. 57, 59 (1924); *Oliver v. United States,* 466 U.S. 170, 178 (1984); *California v. Ciraolo*, 476 U.S. 207, 213 (1986). In fact, the Ninth Circuit has already made clear that there can be no reasonable expectation of privacy for illegal activities conducted on "land open to the public which may be viewed by any passing visitor or law enforcement officer." *McIver*, 186 F.3d at 1125-26. In *McIver*, the defendants were videotaped by a motion-activated camera while cultivating marijuana on public land in a national forest. *Id*. at 1125. Rejecting the argument that the use of an unmanned camera transformed the observation of defendants into a search, the court held that the defendants had failed to establish a reasonable expectation of privacy. *Id*.

Here, all the stationary vehicles captured video of activity occurring out in public in the vicinity of and near the Alameda County and Contra Costa County auctions. The recordings were made during and around the time of public foreclosure auctions, sometimes attended by dozens of people, and

adjacent to public sidewalks with substantial foot traffic. Defendants do not contend otherwise. Under these circumstances, there is no reasonable expectation of privacy.

## CONCLUSION

Given that defendants have not identified specific stationary recordings that captured their voices, defendants have not shown a factual nexus between the stationary recordings and other derived evidence, the government will not introduce any stationary audio recordings, and no other evidence was derived from the stationary recordings shown to witnesses, the Court should deny defendants' motion to suppress the stationary audio recordings for lack of standing and as moot. In the alternative, the United States requests that the Court order the defendants to establish standing for specific recordings and provide sufficient facts showing a nexus to other derivative evidence. If any contested derivative evidence remains, the Court can then proceed with the taint inquiry of the limited recordings. The United States also requests that the Court deny defendants' motion to suppress the stationary video recordings because video surveillance in public places is permissible under the Fourth Amendment.

DATED: April 20, 2016                    Respectfully submitted,

                                                               /S/
                                     ALBERT B. SAMBAT
                                     Trial Attorney
                                     Antitrust Division
                                     U.S. Department of Justice