1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

              Plaintiff,

    v.

MICHAEL MARR, JAVIER SANCHEZ,
GREGORY CASORSO, and VICTOR
MARR,

            Defendants.

Case No.  14-cr-00580-PJH

**PRETRIAL ORDER NO. 2**

Before the court are defendants' motions for a bill of particulars (doc. no. 65), to dismiss the mail fraud counts (doc. no. 67), to adjudicate the Sherman Act allegations pursuant to the rule of reason (doc. no. 66), and to suppress warrantless audio recordings (doc. no. 68).  The parties have filed supplemental post-hearing briefs, and the matters are deemed submitted.  The government's motion to exclude the declaration of defendant Gregory Casorso is DENIED, and defendants are granted leave to file the untimely declaration.  The court ORDERS as follows:

    1.        Defendants' motion for a bill of particulars is DENIED.  Doc. no. 65.  The government has provided discovery in an organized manner, and defendants seek specific categories of detailed evidence which is not required of a bill of particulars. *United States v. DiCesare*, 765 F.2d 890, 897 (9th Cir. 1985); *United States v. Giese*, 597 F.2d 1170, 1180 (9th Cir. 1979) ("there is no requirement in conspiracy cases that the government disclose even all the overt acts in furtherance of the conspiracy").  The court has previously ordered early disclosure of the government's witness and exhibit lists, and of co-conspirator statements, to address defendants' concern about being able to

prepare for trial more effectively and efficiently in light of the voluminous discovery.

2.      Defendants' motion to dismiss the mail fraud counts is DENIED.  Doc. no. 67.  The indictment describes the alleged scheme to defraud and scheme to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and specifies the following information for each mail fraud count: (1) the individual defendants who knowingly caused the use of the mails (either United States mail or private or commercial carrier); (2) approximate date; (3) recipient; (4) sender; and (5) description of the item delivered.  Indictment (doc. no. 1) ¶¶ 15-19, 30-34.  The indictment sufficiently contains "the elements of the charged crime in adequate detail to inform the defendant of the charge and to enable him to plead double jeopardy."  *U.S. v. Awad*, 551 F.3d 930, 935 (9th Cir. 2009) (citation omitted).

3.      Defendants' motion to adjudicate the Sherman Act counts pursuant to the rule of reason is DENIED.  Doc. no. 66.  The indictment charges defendants with a conspiracy involving an agreement not to compete at public foreclosure auctions, designating which conspirator would win selected properties at the public auction, and holding secondary private auctions to determine the conspirator who would be awarded the selected properties and to determine the payoff amounts for those agreeing not to compete.   This type of conduct falls squarely within the per se category of bid-rigging, which is widely recognized as a form of price-fixing, which is "conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use."  *Northern Pac. Ry. Co. v. U.S.*, 356 U.S. 1, 5 (1958).

Defendants cite *Paladin Associates, Inc. v. Montana Power Co*., 328 F.3d 1145, 1154-55 (9th Cir. 2003), where the court noted that it was appropriate to apply the rule of reason "because plausible arguments that a practice is procompetitive make us unable to conclude 'the likelihood of anticompetitive effects is clear and the possibility of countervailing procompetitive effects is remote.'"  *Id.* at 1155 n.8 (quoting *Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co*., 472 U.S. 284, 294

United States District Court
Northern District of California

1   (1985)).  Neither *Paladin* nor *Northwest Wholesale Stationers* (both civil cases involving

2   private litigants) involved an anticompetitive agreement that fell squarely within a per se

3   category, and neither case stands for the proposition that defendants may offer plausible

4   arguments in support of a rule of reason analysis to a category of economic activity that

5   merits per se invalidation under Section 1 of the Sherman Act.  *See Northwest Wholesale*

6   *Stationers,* 472 U.S. at 293, 295-96 (distinguishing the wholesale cooperative at issue

7   from group boycotts subject to per se treatment, where the case "turns on . . .  whether

8   the decision to expel Pacific is properly viewed as a group boycott or concerted refusal to

9   deal mandating per se invalidation"); *Paladin,* 328 F.3d at 1154-55 ("even if Northridge

10  and MPC are, in a sense, competitors, the type of agreement at issue here cannot be

11  considered one that will 'always or almost always tend to restrict competition.'") (quoting

12  *Northwest Wholesale Stationers*, 472 U.S. at 289).  The court declines defendants'

13  invitation to carve out an exception from the per se rule that applies to bid-rigging simply

14  because it took place during a recession or in the wake of a housing bubble, given the

15  weight of authority recognizing bid-rigging as a category of anticompetitive conduct

16  subject to per se treatment.  *U.S. v. Green*, 592 F.3d 1057, 1068 (9th Cir. 2010)

17  (affirming CR 05-208 WHA (N.D. Cal.)); *U.S. v. Romer*, 148 F.3d 359 (4th Cir. 1998);

18  *U.S. v. Koppers Co., Inc.*, 652 F.2d 290, 295 (2d Cir. 1981).

19          By contrast to *Paladin* and *Northwest Wholesale Stationers*, where the courts

20  considered whether the alleged conduct fit into the per se category of group boycotts, an

21  alleged agreement not to compete at a public auction, to designate the winner at the

22  public auction, and to negotiate payoffs for agreeing not to compete is the kind of

23  agreement that courts have deemed to be unlawful under Section 1 of the Sherman Act,

24  as recognized by the antitrust bar:

25                  The indictment charges the defendants with conspiring to rig
            the results of an auction.  An auction-rigging conspiracy is an
26          agreement between two or more persons to eliminate, reduce
            or interfere with competition for a product, job or contract that
27          is to be awarded on the basis of auction bids.  In this case,
            defendants have been charged with conspiring to rig the
28          results of the [auction title or description] by deciding in

1   advance which of them should be the successful bidder on
    particular items.

2   ABA MODEL JURY INSTRUCTIONS IN CRIMINAL ANTITRUST CASES at 62-63 (2009)).  As the

3   government points out, the per se rule has been consistently applied in prosecutions for

4   bid-rigging in the context of public foreclosure auctions, though admittedly the defendants

5   in those cases did not litigate the application of the per se rule.  *U.S. v. Romer*, 148 F.3d

6   359 (4th Cir. 1998); *U.S. v. Guthrie*, 814 F. Supp. 942 (E.D. Wash. 1993), *aff'd*, 17 F.3d

7   397 (9th Cir. 1994) (unpublished); *U.S. v. Katakis*, CR 11-511 WBS (E.D. Cal. March 11,

8   2014).

9   Even if the reasoning of *Paladin* could be extended to a per se bid-rigging

10  prosecution, the court is not persuaded that defendants have offered "plausible

11  arguments" about the procompetitive effects of their agreement that would warrant

12  analysis under the rule of reason.  Defendants argue that they were competing in a

13  unique market, where the banks effectively dominated the market for foreclosed

14  properties and set their own price as buyers by determining the opening bid as sellers at

15  the public auction.  This "unique position" of the banks is not unique to the time period

16  charged in the indictment.  As recognized by defendants' consultant, "In public

17  foreclosure auctions, the mortgage holder sets the opening bid amount. . . . If a third

18  party does not bid higher than the opening bid, then the bank retains the property and is

19  able to resell it in the open market."  Andrien Decl. (doc. no. 66-1) ¶ 16.  The fact that

20  defendants are charged with an agreement not to compete during a time when there was

21  a glut of foreclosures does not render their anticompetitive agreement subject to a

22  "plausible argument" that their arrangement was "intended to enhance overall efficiency

23  and make markets more competitive."  *Northwest Wholesale Stationers,* 472 U.S. at 294,

24  296 (recognizing that wholesale purchasing cooperatives "are not a form of concerted

25  activity characteristically likely to result in predominantly anticompetitive effects" and that

26  "[t]he act of expulsion from a wholesale cooperative does not necessarily imply

27  anticompetitive animus and thereby raise a probability of anticompetitive effect").

28

United States District Court
Northern District of California

Defendants have not demonstrated that the housing foreclosure market was exceptional in any way other than the volume of properties available, nor have they argued that they were precluded from competing in the open market. *See U.S. v. Alston*, 974 F.2d 1206, 1209 (9th Cir. 1992) (rejecting argument that that the agreement among dentists on higher co-payment fees to be paid by prepaid dental plans should have been analyzed under the rule of reason, holding that the health care market was not an exceptional market in which horizontal restraints on competition were necessary to make the product available on the market at all). Defendants were not prevented from entering the market without an agreement not to compete; defendants could have openly competed in the public foreclosure auctions against the banks and other competitors, including co-conspirators. The Sherman Act violations charged in the indictment allege an agreement among competitors not to compete against each other at auction, a bid-rigging arrangement mandating per se treatment because "the likelihood of anticompetitive effects is clear and the possibility of countervailing procompetitive effects is remote." *Northwest Wholesale Stationers*, 472 U.S. at 294. "This principle of per se unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken." *Northern Pac. Ry.*, 356 U.S. at 5.

4. The court has received supplemental briefs and audio recordings in support of defendants' motion to suppress. After reviewing the supplemental filings, the court will determine whether to set a further hearing on the motion to suppress. Doc. no. 68.

**IT IS SO ORDERED.**

Dated: June 21, 2016

_____
PHYLLIS J. HAMILTON
United States District Judge

United States District Court
Northern District of California

5