ALBERT B. SAMBAT (CSBN 236472)
ALEXIS J. LOEB (CSBN 269895)
DAVID J. WARD (CSBN 239504)
SUSAN A. MUSSER (MOBN 63116)
U.S. Department of Justice
Antitrust Division
450 Golden Gate Avenue
Box 36046, Room 10-0101
San Francisco, CA 94102
albert.sambat@usdoj.gov
Telephone: (415) 934-5300

Attorneys for the United States

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MICHAEL MARR,<br>JAVIER SANCHEZ,<br>GREGORY CASORSO, and<br>VICTOR MARR,<br>           Defendants. | CASE NO. CR 4:14-00580 PJH<br><br>**NOTICE OF COCONSPIRATOR STATEMENTS**<br><br>Trial Date: September 19, 2016<br>Court: Hon. Phyllis J. Hamilton |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………………………...ii

INTRODUCTION .................................................................................................................. 1

LEGAL STANDARD............................................................................................................. 1

ARGUMENT.......................................................................................................................... 2

I.   The Existence of the Conspiracy and Defendants' Participation……………….......….3

     A.   Proof of the Existence of the Conspiracies to Rig Bids and Schemes to
          Defraud .................................................................................................................. 4

     B.   Defendants' Membership in the Conspiracy........................................................ 8

II.  Factual Proffer Establishing Statements Made During and in Furtherance of the
     Conspiracy ................................................................................................................. 11

     A.   Round Sheets ...................................................................................................... 11

     B.   Payoff Ledgers .................................................................................................... 12

     C.   Emails ................................................................................................................. 13

     D.   Recordings .......................................................................................................... 13

     E.   Other ................................................................................................................... 14

     F.   Anticipated Witness Testimony.......................................................................... 14

CONCLUSION.................................................................................................................... 15

# TABLE OF AUTHORITIES

**CASES**

*Bourjaily v. United States*, 483 U.S. 171 (1987) ................................................................ 1, 8, 15

*United States v. Gil*, 58 F.3d 1414 (9th Cir. 1995) ....................................................................... 13

*United States v. Gordon*, 844 F.2d 1397 (9th Cir. 1988) .............................................................. 1

*United States v. Helmel*, 769 F.2d 1306 (8th Cir. 1985) ............................................................. 13

*United States v. Herrera-Gonzalez*, 263 F.3d 1092 (9th Cir. 2001) ............................................. 2

*United States v. Larson*, 460 F.3d. 1200 (9th Cir. 2006) .............................................................. 1

*United States v. Martinez*, 430 F.3d 317 (6th Cir. 2005) ........................................................... 13

*United States v. Mason*, 658 F.2d 1263 (9th Cir. 1981) ............................................................... 1

*United States v. Pang*, 362 F.3d 1187 (9th Cir. 2004) ............................................................... 14

*United States v. Reed*, 575 F.3d 900 (9th Cir. 2009) .................................................................... 2

*United States v. Schmit,* 881 F.2d 608 (9th Cir. 1989) ............................................................... 13

*United States v. Smith*, 893 F.2d 1573 (9th Cir. 1990) ............................................................... 13

*United States v. Stapleton*, 293 F.3d 1111 (9th Cir. 2002) .......................................................... 3

*United States v. Tamez*, 941 F.2d 770 (9th Cir. 1991) ................................................................. 1

*United States v. Yarbrough*, 852 F.2d 1522 (9th Cir. 1988) ........................................................ 2

*United States v. Zaragoza,* CR-08-0083 PJH ............................................................................... 2

**STATUTES**

18 U.S.C. § 1341 ............................................................................................................................ 3

**RULES**

Criminal Local Rule 16-1(c)(4) ................................................................................................. 1, 2

Federal Rule of Evidence 801(d)(2) .............................................................................................. 3

Federal Rule of Evidence 801(d)(2)(E) ............................................................................... 1, 2, 13

Federal Rule of Evidence 803(6) ................................................................................................... 3

# INTRODUCTION

The government seeks to introduce numerous coconspirator statements at trial against defendants under Federal Rule of Evidence 801(d)(2)(E). Criminal Local Rule 16-1(c)(4) requires the government to give notice of the coconspirator statements the government intends to offer at trial, and the Court has discretion in determining the order of proof for ruling on the admissibility of those statements. The government hereby provides that notice and asks the Court to conditionally admit the attached coconspirator statements.

# LEGAL STANDARD

Criminal Local Rule 16-1(c)(4) of the Northern District of California requires supplemental disclosure of "[a] summary of any statement the government intends to offer under Fed. R. Evid. 801(d)(2)(E) in sufficient detail that the Court may rule on the admissibility of the statement" in order to "expedite the trial of the case." Admissibility under 801(d)(2)(E) requires a showing by preponderance of the evidence that "(1) the conspiracy existed when the statement was made; (2) the defendant had knowledge of, and participated in, the conspiracy; and (3) the statement was made 'in furtherance of' the conspiracy." *United States v. Larson*, 460 F.3d. 1200, 1211 (9th Cir. 2006) (citations omitted); *see Bourjaily v. United States*, 483 U.S. 171, 175 (1987) (preponderance-of-evidence standard applies for determining facts relevant to Rule 801(d)(2)(E)). The Confrontation Clause does not require the court to make an inquiry into the independent indicia of the reliability of the statement. *Bourjaily*, 483 U.S. at 182.

Although coconspirator statements alone cannot prove the existence of a conspiracy, the statements themselves may be considered in determining the existence of the conspiracy. *United States v. Gordon*, 844 F.2d 1397, 1402 (9th Cir. 1988); *see also Bourjaily*, 483 U.S. at 181 (stating that "the judge should receive the evidence and give it such weight as his judgment and experience counsel")(quotations and citations omitted); *United States v. Tamez*, 941 F.2d 770, 774-75 (9th Cir. 1991). Once the government shows evidence of a conspiracy, the government needs only to "present slight evidence connecting the defendant to the conspiracy." *United States v. Mason*, 658 F.2d 1263, 1269 (9th Cir. 1981). Recognizing that conspiracies are generally clandestine agreements not capable of direct proof, the Ninth Circuit has held that

proof of the slight connection "may be inferred by circumstantial evidence." *United States v. Reed*, 575 F.3d 900, 924 (9th Cir. 2009) (*quoting United States v. Herrera-Gonzalez*, 263 F.3d 1092, 1095 (9th Cir. 2001)).

## ARGUMENT

This memorandum seeks to provide the Court with a factual proffer sufficient to establish the first two elements that Rule 801(d)(2)(E) requires: the existence of a conspiracy and the defendants' involvement in the conspiracy. In addition, consistent with the Court's established procedure for complying with Crim. L.R. 16-1(c)(4), the government will provide, for each coconspirator statement sought to be introduced at trial:

(1) the identity of the testifying witness and/or the source of the conspirator statement;
(2) a statement describing the witness and/or the source of the conspirator statement;
(3) a summary of evidence sufficient to show that the proffering witness, if a conspirator, knew about and participated in the conspiracy;
(4) the coconspirator statements to be introduced via that witness and/or the source of the conspirator statement;
(5) the identity of the declarant of each specific coconspirator statement; and
(6) a summary of evidence sufficient to show that each declarant of the conspirator statement(s) knew about and participated in the conspiracy.

*See United States v. Zaragoza, et al.*, CR-08-0083 PJH, Dkt. 576 (Amended Order for Pretrial Preparation for Criminal Jury Trial). Evidence supporting the third element – that the statement was made in furtherance of the conspiracy – is provided in Part II below and will also be established at trial. To be made in furtherance of the conspiracy, a statement "must further the common objectives of the conspiracy or set in motion transactions that are an integral part of the conspiracy." *United States v. Yarbrough*, 852 F.2d 1522, 1535 (9th Cir. 1988) (citation omitted). Courts have interpreted the "in furtherance of" requirement broadly. *See id.* at 1535-36.

The government understands that the Court will refrain from ruling on the third prong - that the statement was made in furtherance of the conspiracy – and therefore the ultimate admissibility determination, until after trial. However, the government requests, based on this motion and proffered evidence, that the Court make a pretrial ruling on the first two prongs: that

the conspiracy existed when the statement was made and that defendants had knowledge of, and participated in, the conspiracy. This will help the government streamline its evidence and efficiently present its case-in-chief at trial.

Out of an abundance of caution, the government has included statements here that are nonhearsay for other reasons or admissible under an exception to the hearsay rule. The inclusion of a statement in this disclosure should not be interpreted as an admission by the government that the statement is hearsay or that it is admissible solely as a coconspirator statement. For example, some of the statements included in this notice are also admissible as exceptions to the hearsay rule because they are part of a business record that is admissible pursuant to Federal Rule of Evidence 803(6) or because they may not be offered for the truth of the matter asserted, and are therefore not hearsay. The government has not, however, noticed defendants' statements, which are admissible as admissions under Federal Rule of Evidence 801(d)(2).

Statements made in furtherance of a scheme to defraud are admissible on the same basis as coconspirator statements. *United States v. Stapleton*, 293 F.3d 1111, 1117 (9th Cir. 2002). The coconspirator statements the government intends to introduce are relevant and admissible to prove the bid-rigging conspiracies and the schemes to defraud.

## I. The Existence of the Conspiracy and Defendants' Participation

On November 19, 2014, a federal grand jury indicted Michael Marr, Javier Sanchez, Gregory Casorso, and Victor Marr for bid rigging, in violation of 15 U.S.C. § 1, and mail fraud, in violation of 18 U.S.C. § 1341. All defendants are charged with one count of bid rigging in connection with a conspiracy in Alameda County, and Michael Marr and Sanchez are also charged with a second count of bid rigging in connection with a conspiracy in Contra Costa County. Indictment, Dkt. 1, Counts 1, 6. Various subsets of the defendants are charged in six counts of mail fraud as part of a larger scheme to defraud involving hundreds of properties in both Alameda and Contra Costa counties. *Id.*, Counts 2-5, 7-8.

//
//
//

### A. Proof of the Existence of the Conspiracies to Rig Bids and Schemes to Defraud

As alleged in the indictment, defendants participated in bid-rigging conspiracies and mail-fraud schemes beginning as early as June 2008 and continuing until in or about January 2011. Indictment ¶¶ 8, 15, 23, 30. By way of background, in California, when a homeowner defaults on his or her loan, the property is typically subject to a process called nonjudicial foreclosure. Nonjudicial foreclosure is a process that allows a third party – a trustee – the right to sell the property at a public, competitive auction and distribute the proceeds to the beneficiary of the loan (and, depending on the equity in the house, the homeowner). For years, defendants and their coconspirators corrupted this system. The conduct underlying the bid-rigging conspiracies and fraud schemes had several phases: (1) the agreement at the public auction; (2) the "round robin" (a/k/a "round"); (3) the submission of auction paperwork and receipt of the deed; and (4) paying and receiving payoff money. The conspiracies and schemes worked in essentially the same manner in Alameda and Contra Costa counties. The evidence proffered below establishes their existence by a preponderance of the evidence.

#### 1. Agreement to Refrain from Bidding at the Public Auction

First, rather than bidding in competition with each other during the public auction, defendants and their coconspirators[1] agreed to refrain from bidding against one another for selected properties and, instead, designated one member of the conspiracy to bid at the public auction, while the rest refrained from bidding. Declaration of Alexis Loeb ("Loeb Decl"), Exhibit A. Sometimes the agreement to refrain from bidding and hold a round was made prior to the auction. *Id.* Exs. A, B. More frequently, it was formed during the public auction for a given property. *Id.* Ex. C. To give each other time to work out who was a part of the agreement and who would "take" the property at the public auction, conspirators would often bid in small increments, usually $100. *Id.* Ex. D. According to numerous cooperators, the conspirators used code words, phrases, and gestures to communicate their intent to stop bidding and round a

---

[1] For ease of reference, the government will refer to the participants in the two bid-rigging conspiracies and the two mail-fraud schemes as simply "coconspirators."

No. CR 4:14-00580 PJH
NOTICE OF COCONSPIRATOR STATEMENTS                4

property. *Id.* Ex. E.  For example, they would ask one another whether they wanted to "work it out," or "work this," or "you in?" or something similar.  *Id.* Ex. F.  Often, instead of speaking to one another, the conspirators communicated their intent to round the property simply by looking at one another, nodding, or tapping each other on the shoulder.  *Id.* Ex. G.  Once the agreement was formed, the conspirators would select one person to "take it" at the public auction.  *Id.* Ex. H.  This person would continue bidding at the public auction until he or she outbid any auction bidders who were not a part of the conspiracy, at which point, the auctioneer would announce that the property had sold.  *Id.* Ex. I.  The winning bidder would then provide the auctioneer with checks to purchase the property.  *Id.* Ex. J.  By suppressing competition, defendants intended to acquire properties at the public auction for the lowest possible price.  *Id.* Ex. K.

### 2. Rounds

After the public auction, defendants negotiated the payoff for agreeing not to compete and decided who would ultimately take title to the property.  At times, the bidder who wanted to purchase the home paid the others a negotiated flat amount for refraining from bidding.  *Id.* Ex. L.  More frequently, defendants held private auctions, called "round robins" or "rounds" – second auctions just among the conspirators pursuant to the bid-rigging agreement.  *Id.* Ex. M.  The conspirators would stand in a circle and bid in small increments—often $200—in the order they were standing.  *Id.* Ex. N.  The highest bidder in the round owed that money to the losing round bidders.  This payoff was distributed among the round participants using a set formula that provided for more payoff money the longer a participant remained in the round.  *Id.* Exs. O, Q.  To keep track of the round participants and payoff amounts the conspirators created "round sheets," which typically listed the participants in the round, the amount each participant bid on the round, the property address, and the calculations for determining how much each participant was owed.  *Id.* Ex. P.

There were other rules to the rounds as well.  Some conspirators required that each participant prove that they had sufficient funds to cover the public auction purchase price.  *Id.* Ex. R.  If the participant could not produce a cashier's check to cover the price, he or she could

//

be barred from participating in the round. *Id*. Ex. R. This ensured that only legitimate competitors were a part of the round.

Larger organizations, such as defendant Michael Marr's, were allowed multiple "seats" in the round. *Id.* Ex. S. This meant that each representative in a given organization could bid in the round and could each collect the payoff. *Id.* Ex. T.

There was also a concept of "insurance" in the rounds. If a round participant was no longer interested in bidding in a round, he or she could get insurance from another bidder. *Id.* Ex. U. This meant that he or she would continue bidding in the round and, if he or she won the round, the insurer would take the property off the insured bidder's hands. *Id*. Ex. U. If the insured person did not win the property in the round, he or she would owe half of the additional payoff money they received from staying in the round to the insurer. *Id*. Ex. U. Through this sophisticated system of second auctions, the conspirators determined how much they would be paid for their agreement to stop bidding during the public auction.

### 3. Auction Paperwork and Receipt of Title

After the round, the round winner had to complete the sale by filling out the auction paperwork. *Id.* Ex. V. Frequently, however, the public auction winner and the round winner were not the same. *Id.* Ex. W. The round winner and the public auction winner would then go back to the auctioneer to "swap checks" and fill out the auction paperwork so that the round winner, and not the public auction winner, actually provided funds for the purchase. *Id.* Ex. X. The conspirators had a practice of tipping the auctioneers for allowing this and other favors. *Id.* Ex. Y.

The round winner then needed to complete a "Receipt of Funds" ("ROF"). The ROF was a document that was used by the trustee to determine the winner of the public auction, how much the property sold for, and to whom title should be issued. *Id.* Ex. Z. To ensure that title to the property went to the round winner, the conspirators provided information for the ROF that created the false impression that the round winner had bid competitively at and won the public auction. They accomplished this false pretense in several ways. For example, the round winner and the public auction winner sometimes represented themselves as partners or cobuyers on the

ROFs to make it appear as if they were purchasing the property jointly. *Id.* Ex. AA. By doing so, the conspirators concealed their participation in a round. On other occasions, only the round winner's name was listed on the ROF. *Id.* Ex. AB. The round winner, however, had merely qualified to bid, and either did not bid at all or bid against his or her coconspirators only while the agreement was being formed. *Id.* Ex. AC. By completing this form and certifying that the high bid amount was accurate, the round winner gave the false impression that he or she had competitively bid during the public auction and had won the property. And this false impression was necessary to ensure that the property vested to the round winner instead of the public auction winner.

Finally, the purchase price on the ROF was the amount bid at the public auction and did not include the additional money the conspirators bid and paid during the round. *Id.* Ex. AD. The buyer provided the information for the ROF and signed and certified that it was true and correct. *Id.* Ex. AE. When there was a round, the conspirators completed this auction paperwork knowing it would create the false impression that they had competitively won the public auction.

### 4. Making and Receiving Payoffs

After the auction paperwork was complete, the auctioneer mailed it and the purchase funds to the trustee by FedEx. *Id.* Ex. AF. Once the trustee received the funds and auction paperwork, the trustee mailed the funds to the lienholder and mailed the title, the Trustee's Deed Upon Sale (Trustee's Deed), to the buyer listed on the ROF. *Id.* Ex. AG. Typically, the payoff money for the rounds was not due until the round winner received the Trustee's Deed in the mail. *Id.* Ex. AH. This was because the sale of the property could be rescinded by the trustee after the sale at the public auction. The conspirators did not want to pay each other off if that happened.

Round payments were made by cash or check. *Id.* Ex. AI. For newer members of the conspiracy, round payments were sometimes required that same day or the day after. *Id.* Ex. AJ. For frequent participants, the coconspirators often let the round payments accrue for some amount of time, and then would meet with one another to "settle up" or reconcile their respective debt. *Id.* Ex. AK. In pay/owe ledgers specific to individual conspirators, defendants would track how much money was owed for properties for which they won the round and subtract it from the

money they were owed for rounds they lost. *Id.* Ex. AL. They would offset these amounts and determine the outstanding balance. *Id.* Exs. AM, AN.

Round payments were made at various locations. The conspirators frequently met at each other's offices. Sometimes, however, they would meet in other locations, such as a parking lot or a McDonalds across the street from the auction. *Id.* Ex. AO. Larger offset payments were frequently made by check. *Id.* Ex. AP.

In this way, for years, defendants and their coconspirators corrupted the public foreclosure auctions in Alameda and Contra Costa counties and diverted to each other money that should have gone to the beneficiaries. On January 11, 2011, the FBI's investigation went overt and the conspiracy ended. In total, 37 individuals have pleaded guilty before this Court for participating in the charged conspiracies and schemes. *See* Dkt. 86-1, ¶ 16. In plea agreements, these individuals admitted to participation in the conspiracy and fraudulent scheme. In a representative example from the factual basis section of a plea agreement, one coconspirator admitted that during the relevant time period he "participated in a conspiracy to rig bids to obtain the Alameda County selected properties. The primary purpose of this conspiracy was to suppress and restrain competition to purchase the Alameda County selected properties at non-competitive prices." *See e.g.*, Loeb Decl. Ex. AQ. The coconspirator further admitted to participation in a scheme to "fraudulently acquire title to selected properties sold at public auctions in Alameda County and to divert to co-schemers money that would have gone to beneficiaries. Among other things, the defendant and his co-schemers executed a deceptive scheme by holding second, private auctions, known as 'rounds,' to determine payoff amounts . . . ." *Id.* Ex. AQ. These guilty pleas provide evidence of the existence of the conspiracy and scheme. *See Bourjaily,* 483 U.S. at 178 ("The Rule [104] on its face allows the trial judge to consider any evidence *whatsoever*, bound only by the rules of privilege.") (emphasis added).

### B. Defendants' Membership in the Conspiracy

The evidence proffered below establishes by a preponderance of the evidence that each defendant knowingly participated in the charged conspiracy and scheme.

//

### 1. Michael Marr

Michael Marr is the owner and head of Community Fund, LLC ("CFUND"), a real estate investment company that buys, renovates, and resells properties. CFUND employees are implicated in 1,369 of the rigged properties in Alameda and Contra Costa counties. Marr initially attended the Alameda County auctions in person and participated in rounds himself in mid-2008. During the relevant time period, as his business was expanding, Marr gave his employees responsibility for purchasing properties at the auctions on CFUND's behalf. Marr directed employees – including defendants Javier Sanchez, Greg Casorso, and Victor Marr, and cooperating defendant Wesley Barta – to participate in rounds in Alameda and Contra Costa counties.

Numerous cooperating defendants implicate Michael Marr. Loeb Dec. Ex. AR. Many, in fact, identify Michael Marr as a ringleader. *Id.* Ex. AS. One witness describing the Alameda County auctions said "Marr has taken full control of the Alameda trustee sales. No one will purchase a property through a trustee sale without paying off Michael Marr through the rounds." *Id.* Ex. AT. Regarding the Contra Costa auctions, several witnesses identify Marr's CFUND organization as among "the biggest players" from June 2008 through January 2011. *Id.* Ex. AU.

Additionally, cooperating defendant Wesley Barta, who worked for Michael Marr, was always on the cell phone with Michael Marr during the public auctions and received instructions from him about which properties to bid on, whether to agree with other bidders to stop bidding, and what amount to bid. *Id.* Ex. AV. Michael Marr also personally reached agreements directly with his competitors over the phone during the public auctions. *Id.* Ex. AW. He also met with coconspirators to discuss what was owed, tabulated the amounts owed on multiple rigged properties on an adding machine, and either collected or paid out monies with CFUND checks. *Id.* Ex. AX. Michael Marr kept such meticulous accounting records that he even verified round payments owed among the conspirators using an adding machine. *Id.* Ex. AY. Barta handed his auction paperwork, including his round sheets, to Marr or Sanchez each day after the public auctions. *Id.* Ex. AZ.

//

### 2. Gregory Casorso

Gregory Casorso is an employee of CFUND and was Michael Marr's point person at the Alameda County auctions. *Id.* Ex. BA. Casorso purchased properties on CFUND's behalf, organized and participated in rounds, and authored round sheets. *Id.* Ex. BB. Casorso also directed other CFUND employees, including co-defendant Victor Marr, to participate in rounds for CFUND. *Id.* Ex. BC. From 2008 through 2010, Casorso participated in nearly 300 rounds in Alameda County. *See* Dkt. 88, Ex. 1. Casorso is not charged with participating in the Contra Costa conspiracies or schemes.

Witnesses describe Casorso as a regular participant in the bid-rigging conspiracy and mail-fraud scheme in Alameda County who often led the rounds. Loeb Dec. Exhibit BD. Documentary evidence also implicates Casorso. For example, his colleague Barta, who is familiar with Casorso's handwriting, can identify over 30 of Casorso's round sheets. *Id.* Ex. BE.

On February 26, 2011, Casorso voluntarily met with the FBI and admitted to participating in rounds and bid rigging at foreclosure auctions in Alameda County. *Id.* Ex. BF. During the nearly seven-hour interview, Casorso demonstrated how rounds worked, created a hypothetical round sheet, and explained how round payout amounts were calculated. *See, e.g., id*. Ex. BF at 6, 9, 10, 13, 16. Casorso identified his coconspirators and told the FBI during the interview that he was the leader for Marr in Alameda County. *See, e.g., id.* Ex. BF at 2 (identifying other participants in rounds); 3 (identifying himself as the leader for Michael Marr). Casorso is also captured on consensual recordings in which he agreed not to bid in return for money or agreed to pay others not to bid and participated in payoffs. *Id.* Ex. BG. In addition, Casorso made false or misleading statements on ROFs. *See, e.g.*, *id*. Ex. BV.

### 3. Victor Marr

Victor Marr participated in rounds at the direction of Michael Marr and Gregory Casorso in Alameda County. *Id.* Ex. BH. He is not charged with participating in the bid-rigging conspiracies or mail-fraud schemes in Contra Costa County.

Victor Marr hosted rounds, authored round sheets, and functioned as an extra seat in the rounds for Michael Marr. *Id.* Exs. BH, BI. Numerous cooperating defendants have discussed

Victor Marr's participation in rounds. *Id.* Ex. BJ. These witnesses describe his role as a seat in rounds and identify specific properties auctioned in Alameda County where he participated. *Id.* Ex. BJ. From 2008 through 2010, Victor Marr participated in over 100 rounds in Alameda County. In addition, Victor Marr was involved in making false or misleading statements on ROFs. *See, e.g.*, *id*. Ex. BW.

### 4. Javier Sanchez

Sanchez is an employee of defendant Michael Marr. *Id.* Ex. BK. Sanchez organized and participated in rounds on CFUND's behalf in both Alameda and Contra Costa counties. From 2008 through 2010, Sanchez participated in over 300 rounds in both counties; accordingly, numerous cooperating defendants have identified Sanchez as a regular round participant. *Id.* Ex. BL. In Contra Costa County, Sanchez would typically attend the auctions with Wesley Barta. Sanchez participated in rounds and wrote dozens of round sheets. *Id.* Ex. BM.

Sanchez frequently was the bidder designated by the conspirators to win the public auction. *Id.* Ex. BN. Marr also tasked Sanchez with keeping track of round monies owed among the conspirators in both Alameda and Contra Costa counties. *Id.* Ex. BO. In addition, Sanchez was involved in making false or misleading statements on ROFs. *See, e.g.*, *id*. Ex. BX.

## II. Factual Proffer Establishing Statements Made During and in Furtherance of the Conspiracy

The attached appendices and exhibits identify coconspirator statements the government will seek to introduce at trial. Although the government understands that the Court will reserve ruling on whether each statement was made in furtherance of the conspiracies until the conclusion of the government's case-in-chief, the government offers the following factual proffer as additional evidence that statements found in the following categories of evidence were made in furtherance of the conspiracies/schemes.

### A. Round Sheets

As outlined in Appendix A, the government will seek to introduce numerous coconspirators' round sheets. Round sheets were an integral part of the conspiracies to rig bids and schemes to defraud. During the round, these documents were used to track the individuals

participating in the round, how much they bid during the round, and where they dropped out in the round. Sometimes the round sheets list just the last bid by the participants and sometimes they list all the bids made during the round.

The round sheets served as a conspirator's record of the round. *Id.* Exs. BP, BQ, BR. The statements contained in the round sheets facilitated the conspiracy by providing a record of how much payoff money was owed and to whom.

### B. Payoff Ledgers

The government also seeks to introduce the statements made in the documents in Appendix B, which appear in coconspirators' payment ledgers. The ledgers typically list properties for which two coconspirators participated in a round and the money they owe each other. For example, one section of a ledger will list the properties where coconspirator A, or one of his representatives, won the round and therefore owes money to coconspirator B. The other section of the ledger will list properties for which coconspirator B, or his representatives, won the round and owes coconspirator A money.

Many coconspirators recall meeting with defendant Michael Marr, defendant Casorso, or defendant Sanchez to settle up for rounds, and the ledgers were the coconspirators' tools to facilitate these meetings. *Id.* Ex. BS. Thus, the ledgers furthered the conspiracies by ensuring that the conspirators were paid for their participation in the bid rigging and fraud. Many of the ledgers were found in CFUND's office in folders labeled with a coconspirator's name and with an attached copy of a check as proof of payment. *Id.* Ex. BT.

For a small number of ledgers, the government does not know precisely who created them. The government does know, however, that an individual working for Michael Marr's organization, CFUND, created them, and that Michael Marr and Sanchez used them in payoff meetings with members of the conspiracy to support their calculations for the round money that CFUND owed to others or was owed. Even though the government cannot identify who specifically wrote these documents, they are nonetheless admissible as coconspirator statements. Numerous courts have held that the identity of a declarant of a written or oral statement need not be proven if "circumstantial evidence permits a finding by a preponderance of the evidence that

there was a conspiracy involving the [declarant] and the defendant and the statement was made in the course and furtherance of the conspiracy." *United States v. Martinez*, 430 F.3d 317, 326 (6th Cir. 2005) (affirming admission of an unsigned letter that was found in a place connected to a conspirator and the content of which demonstrated that it was written by someone involved in the conspiracy). "What is essential is that the government show that the unknown declarant was more likely than not a conspirator." *United States v. Helmel*, 769 F.2d 1306, 1313 (8th Cir. 1985) (affirming under Rule 801(d)(2)(E) admission of a ledger prepared by an unknown writer because the government "sufficiently proved that the declarant probably was a member of the conspiracy"). The Ninth Circuit has construed this requirement liberally. *United States v. Smith*, 893 F.2d 1573, 1577-78 (9th Cir. 1990) (evidence linking the statements to coconspirators can be purely circumstantial), and *United States v. Schmit,* 881 F.2d 608, 612-14 (9th Cir. 1989) (same). Where there is sufficient evidence to prove the declarant was a member of the conspiracy, proving the identity of each declarant with certainty is unnecessary. This is especially true where, as here, there is no "real mystery as to the participants in the . . . conspiracy." *See United States v. Gil*, 58 F.3d 1414, 1419 (9th Cir. 1995). The evidence suggests that the ledgers were written by someone involved in the conspiracy because (1) they were found in Marr's office, (2) the purpose of such documents was to track the illegal payoffs, and (3) they were adopted and used (if not actually created) by Marr and Sanchez to reconcile the payoffs with coconspirators.

### C. Emails

Occasionally, the coconspirators sent emails regarding payments owed for rounds. Loeb Decl. Ex. BU. Emails that the government will seek to introduce are described in Appendix C. Such communications were in furtherance of the conspiracy because they enabled coconspirators to track and enforce their agreements and obtain payoffs.

### D. Recordings

The government will also introduce coconspirator statements through consensual audio/video recordings outlined in Appendix D. In these recordings, defendants and their coconspirators can be seen and heard: (1) agreeing to refrain from bidding at the public auction;

(2) participating in rounds; (3) meeting to settle up for past rounds; and (4) discussing payments owed for rounds. The statements made during each of these activities are proof of the defendants' participation in the conspiracy and furthered the conspiracy because they form the basis of the collusive and fraudulent conduct alleged in the indictment. The statements made during public auctions show the agreement to refrain from bidding; the statements made during rounds form the basis of the both the bid-rigging conspiracies and mail-fraud schemes; and the statements made during settle-up meetings furthered the conspiracies by ensuring the conspirators were paid – the motive and purpose of the conspiracy.

### E. Other

In addition to the types of documents described above, the government plans to introduce other documents containing coconspirator statements. First, out of an abundance of caution, the government has noticed a narrow category of payoff checks where the coconspirators wrote certain information, such as the address of the rigged property, on the check.[2] These checks were the payoffs from the bid rigging and fraud – as such, not merely were they in furtherance of the conspiracy, but they were a primary objective of the conspiracy. Second, the government has noticed "net sheets," where conspirators calculated their acquisition costs for a given property, including round payments. These documents were created in furtherance of the conspiracy because they enabled members of the conspiracy to assess their costs and revenues from the scheme. The government has also noticed other documents containing conspirators' notes relating to meetings and payoffs.

### F. Anticipated Witness Testimony

Witnesses at trial will testify to what coconspirators said to reach agreements to rig the public auctions, conduct rounds, determine and make payoffs, and conceal their conduct. For example, they may testify to what a coconspirator said during an auction to designate a property for rounding, or to statements made by another regarding the amount and timing of a payoff.

---

[2] The checks are primarily admissible as non-hearsay, self-authenticating verbal acts. *United States v. Pang*, 362 F.3d 1187, 1192 (9th Cir. 2004). They are further admissible as business records.

This was a conspiracy that defendants conducted, for the most part, face-to-face or over the phone. Their statements to each other were in furtherance of nearly all aspects of the conspiracy: how they recruited new members, reached agreements not to bid and to stop bidding, conducted rounds, negotiated payoffs, made false and misleading statements, and concealed their conduct.

Appendix F describes coconspirator statements that the government's witnesses may include in their testimony at trial. The government has created this appendix by drawing from reports of prior interviews with the witnesses. The reports, however, have not been reviewed or adopted by the witnesses and are not verbatim transcripts of the witnesses' statements. And the government cannot predict exactly what the witnesses will say at trial.

## CONCLUSION

The government respectfully submits that it has made the necessary preliminary showing under *Bourjaily* for the Court to admit the proffered coconspirator statements.

DATED: July 20, 2016

Respectfully submitted,

/s/
ALEXIS J. LOEB
Trial Attorney
Antitrust Division
U.S. Department of Justice